13604

STATE v. ELLIOTT

(168 S. E., 546)

June, 1932.

*Mr. W. D. Jenerette,* for appellant,

*Messrs. G. L. Ford, Solicitor* and *J. R. Long,* for the State.

March 15, 1933.

The opinion of the Court was delivered by Mr. Justice Bonham.

It is with reluctance that I disagree with the opinion in this case, written by Mr. Justice Carter. My disagreement is based upon one issue alone, but it is one of vital importance, not only to the appellant but to the orderly, legal, and constitutional administration of the law. The Constitution of the State, Article 1, § 18, guarantees to every person accused of crime, trial by an impartial jury. It is a right of grave importance, and should not be violated from any conviction of the guilt of the person in whose trial the issue arises. It is a provision for the protection of all the citizens of the State. Not all persons accused of crime are guilty; this provision stands for their protection.

In the case at bar the defendant was convicted of the murder of his wife. A motion for new trial was made on several grounds. The only one I care to consider is contained in these words: "(b) That Paul G. Sarvis was improperly admitted as a juror in the trial of this case, in that he is and was a bonded constable, duly appointed, qualified and having made bond and sworn to arrest and bring to justice all who violate the law; is an officer of this Court and thus illegally drawn and otherwise disqualified for jury duty."

It is not contested that Paul G. Sarvis at the time of the trial was a duly appointed and bonded constable of a magistrate. It is not contested that he was ineligible to sit as a juror in this case. The motion for new trial was denied by the trial Judge on the ground that it was not shown that counsel for defendant had exercised due diligence in ascertaining the status and qualifications of the jurors. It appears to me that defendant's counsel exercised far more than

usual diligence in the effort to ascertain the qualifications and fitness, as well as disqualifications, of the jurors. He did not reside in Horry County. He sought information of the man who was, probably, better qualified to give it than any man in the county, viz., the clerk of the Court, who is *ex officio* a member of the board of jury commissioners, and participated in the drawing of this very jury. It appears by his affidavit that he knew that Sarvis was a duly appointed constable but that he did not apprise counsel of that fact. On the contrary, he assured him that Sarvis was a farmer, a good substantial man, and would make a good juror. It is urged in argument that Sarvis was a bonded constable, whose bond was on file in the clerk's office, and that counsel, with the exercise of due diligence, would have ascertained this fact. This is enforcing the requirement of due diligence with too great harshness. There was literally nothing to suggest to counsel that one of the prospective jurors might be a bonded officer of the law. He had every right to rely upon the presumption that the officers who drew the jury knew their duty and did it. He went to the highest authority from which to gain information of the men who composed the venire. It appears to me that counsel showed unusual diligence in the effort to ascertain all about the jurors. This Court is disposed to apply the rule of due diligence with more leniency where human life is concerned.

In the case of *State v. Johnson*, 123 S. C., 50, 115 S. E., 748, Judge Prince set aside a verdict of guilty because it appeared that a deputy sheriff had sat upon the jury which convicted the defendant. The State appealed. The order of Judge Prince was affirmed because the Court said it did not appear that there was abuse of the discretion vested in him.

In the case of *Garrett v. Weinberg*, 54 S. C., 127, 31 S. E., 341, 34 S. E., 70, it was held that: "New trial should be granted when a disqualified juror sat on the case, of which the parties to the suit, or their attorneys did

not know until after verdict." In that case a juror who sat on the panel and participated in making the verdict had been convicted of larceny, and thus was disqualified under constitutional provision, but this fact was not known by counsel till after the trial. Chief Justice McIver, delivering the opinion of the Court said: "The only remaining inquiry is whether the disqualification of Ardis to serve as a juror entitled the defendants to have their motion for a new trial granted. In view of the express provisions of the Constitution above quoted which are declared mandatory, it is difficult to see how this question can be answered otherwise than in the affirmative. This being a question of title to real estate it is not necessary to cite authority to show that the parties were entitled to a trial by jury. *What that jury should consist of is expressly declared in mandatory terms by the Constitution. It must be a body of twelve men, each of whom must be a qualified elector, and 'all of them must agree to a verdict in order to render the same.' These are the express mandates of the Constitution, and it must be obeyed. But here we have a body of twelve men, one of whom is not a qualified elector, who has undertaken to render a verdict, which, under the terms of the Constitution, they have no power to do, and hence the same should be disregarded and set aside, and a new trial ordered.*" (Italics added.)

It is true that the learned Chief Justice in the case of *State v. Roberston,* 54 S. C., 147, 154, 31 S. E., 868, qualified this language by saying that the rule applied if the parties were ignorant of the disqualification and it could not with reasonable diligence have been discovered. Doubtless, this is the accepted rule, and in my judgment the requirement of due diligence has been fully met in the case now before the Court.

The Constitution guarantees to every person a fair and impartial trial by a jury of his peers. It cannot be said that one has had such trial if there has sat on the jury one who is expressly disqualified to sit there;

and he is not estopped to raise objection thereunto unless it be shown clearly that he has not exercised due diligence in the matter of selecting the jury. The appellant was not convicted by a jury of twelve qualified men. One of them was expressly disqualified. My opinion is that there should be a new trial.

A majority of the Court, as constituted, concurring in the conclusion reached in this opinion, the judgment of the Court is that the judgment below be reversed, and that the cause be remanded to the Court of General Sessions for Horry County for a new trial.

Mr. Chief Justice Blease and Messrs. Circuit Judges C. J. Ramage and G. Dewey Oxner, Acting Associate Justices, concur.

Mr. Justice Carter dissents.

Mr. Chief Justice Blease (concurring).

I am constrained to concur in the opinion of Mr. Justice Bonham because the appellant is sentenced to death. The Courts of our State have always resolved every doubt in favor of a defendant or appellant, when the sentence imposed upon him results in the taking of his life. In the case of *State v. Freely,* 105 S. C., 243, 89 S. E., 643, 645, where the defendant had been sentenced to death and this Court granted him a new trial, Mr. Justice Gage, speaking for the Court, said: "The defendant has only one life here. * * * A life ought not to be taken unless the necessity for it be imperious. The defendant does not go acquit; he must face only another jury."

I trust it is not out of place to again call the attention of jury commissioners to the importance of observing the laws and rules as to filling jury boxes, and the drawing and returning for jury service only such persons as are qualified under the law to act as jurors. Those laws have been enacted for the preservation of the rights of a free people, and they should be highly regarded. See expressions on this subject in the case of *State v. Rector et al.,* 158 S. C., 212, 155

S. E., 385. Let me suggest that the circuit solicitors may do well to explain the jury laws to the jury commissioners, and impress upon them the importance of their being strictly carried out. If the jury commissioners will co-operate in this important matter, the business of the Courts will be greatly expedited, mistrials may not occur so often, and new trials will not be granted so frequently.

MESSRS. CIRCUIT JUDGES C. J. RAMAGE and G. DEWEY OXNER, ACTING ASSOCIATE JUSTICES, concur.

MR. JUSTICE CARTER (dissenting).

H. B. Elliott, Jr., of the County of Horry, this State, was tried in the Court of General Sessions for said county, at the June (1932) term, before Judge S. W. G. Shipp, and a jury, under an indictment charging him with the murder of his wife, May Hardwick Elliott. The jury having returned a verdict of guilty and a motion by the defendant for a new trial being refused, the defendant was thereupon duly sentenced to death by electrocution. From the said verdict, sentence, and judgment thereon the defendant, pursuant to due notice, has appealed to this Court.

The following are the exceptions upon which the appellant asks a reversal of the lower Court:

"1. The Court erred, it is respectfully submitted, in refusing defendant's motion for continuance at the call of the case.

"2. The Court erred, it is respectfully submitted, in refusing defendant's motion for new trial; which motion was made on the grounds herewith submitted in the record."

The exceptions do not comply with the requirement of the rules governing appeals to this Court, and for that reason alone the appeal might be dismissed. The exceptions are too general. Each exception should have contained a clear and succinct statement of the grounds upon which the motion referred to was based. See Rule 4, Section 6 of this Court and, also, the following cases: *Nolf v. Patton,* 114 S. C., 323, 103 S. E., 528; *Holden v. Cantrell,* 100 S. C., 265, 84 S. E.,

826; *State v. Cooper*, 118 S. C., 300, 110 S. E., 152. But on account of the seriousness of the case we will waive this objection and consider the case on its merits.

As to the error imputed to the trial Judge in refusing the motion for a continuance, the same cannot be sustained for the reason that the showing made before the trial Judge at the time of the motion was not sufficient to support the motion. The grounds upon which the motion was based, briefly stated, were: (1) That the defendant and his people were poor and unable to employ able counsel to represent the defendant and that counsel who was representing him had recently been employed (without much hope of compensation) and had not had sufficient time within which to prepare the case for trial and properly guard defendant's rights; (2) that the crime had been recently committed and that public opinion in the county where the trial was to take place was very strong against the defendant, that the papers of that county "were carrying, almost every week, accounts of the affair, and which articles were very much against the defendant and only tended to convince the public of the guilt of the defendant and prejudiced the public against the defendant," and that it was, therefore, under the circumstances, impossible for the defendant to get a fair trial at that time; (3) "that the suspicions of defendant's attorney had been aroused as to the sanity of the defendant" about three days before the time of making the motion, and that it was learned that a physician of Loris, S. C., had treated the defendant for mental derangement, and, further, that defendant's attorney had endeavored to have the defendant examined by local doctors of Conway (the county seat of Horry County where the trial was to take place) but that the doctors at said place refused. In connection with this ground upon which the motion was based, the attorney for the defendant called the trial Judge's attention to Section 6239 of the Code of 1932, which section reads as follows: "Commitment of Person Charged with Crime. Any Judge

of the Circuit Court is authorized to commit to the State hospital any person charged with the commission of any criminal offense who shall, upon the trial before him, be adjudged insane, or in whom there is a question as to the relation of mental disease to the alleged crime, whether such question is raised by the prosecution or defense, or it appears to the Judge from any evidence brought before him or upon his own recognition: Provided, That such commitment shall be for a period of thirty days, at the end of which the patient must be returned to the Court if found sane, or duly committed by such Judge if found insane. When the person committed is financially able to pay, he shall be required to pay for his support and maintenance."

In support of the motion for continuance counsel for the defendant presented his affidavit, also the affidavit of H. B. Elliott, Sr., father of the defendant, tending to support the statements made in the motion for a continuance; and also a certificate of Dr. Huger Richardson of Loris, S. C., reading as follows:

"Loris, S. C., June 6, 1932.

"This is to certify that I have on one occasion treated H. B. Elliott, Jr., for some form of insanity. He acted as if he was scared he was going to die. In my opinion he is suffering from some form of latent insanity.

"[Signed]   Huger Richardson, M.D."

Motions for continuance are largely within the discretion of the trial Judge, and unless there is a clear abuse of such discretion this Court will not reverse a trial Judge in refusing to grant a continuance. As to the grounds for the motion for continuance, stated under subdivision 1, as above set forth, the same are disposed of by the holding of this Court in the case of *State v. Graham,* 161 S. C., .362, 159 S. E., 838. In the *Graham case* the defendant was put on trial two weeks after the alleged murder had been committed. In the case at bar the alleged murder was committed April 6, 1932, and was not put on trial until the June term of 1932. In our

opinion, the appellant has no just ground for complaint in this respect and we may further state, having heard the oral argument of appellant's counsel when the case was heard on appeal and having read his brief, in connection with the transcript of record, that appellant was ably represented in the trial in the lower Court as well as in presentation of the case before this Court.

In regard to the second ground stated above, upon which the motion for a continuance was based, so far as the record discloses, there was no proof presented to the trial Judge in support of the same. In making a motion for a continuance it is not only necessary for the grounds upon which the motion is based to be stated in connection with the motion, but proof of the same should be presented. So far as the record before this Court discloses, not a single affidavit was produced, or any form of proof recognized in legal procedure, in support of the contention that the defendant could not at that time, and in that Court, obtain a fair and impartial trial. Evidently the trial Judge saw nothing to cause him to think the defendant could not obtain a fair trial, and a careful reading of the entire record convinces us that the trial Judge committed no error in refusing the motion upon this ground.

As to the third ground upon which the motion for a continuance was based, that the suspicion of defendant's counsel had been aroused as to the sanity of the defendant and that under the showing it was the duty of the trial Judge to order the defendant sent to the State Hospital for observation and examination before the trial of the case, we are unable to agree with appellant's contention. Under the section of the Code cited by the appellant, which is quoted above, the trial Judge is authorized, under certain conditions, to have a defendant sent to the State Hospital for observation and examination; but it does not follow that it is incumbent upon the trial Judge to make such order in the case before the trial, but such order may be made after the trial, if the

same is warranted under the showing made, and necessarily such action is largely within the discretion of the trial Judge. While it is not stated in the written record before us, it was stated during the argument when the appeal was heard, that after the conviction of the defendant the defendant was sent to the State Hospital for observation and examination and that the authorities of said institution, designated for that purpose, reported that the defendant was sane. The appellant was not prejudiced by the procedure followed by the trial Judge and, in our opinion, has no ground for complaint in this respect.

The appellant's motion for a new trial was based upon the following grounds:

"(1) That the Court erred in refusing defendant's motion for continuance at the call of the case.

"(2) That Paul G. Sarvis was improperly admitted as a juror in the trial of this case, in that he is and was a bonded constable, duly appointed, qualified, and having made bond and sworn to arrest and bring to justice all who violate the law; is an officer of this Court and thus illegally and ineligible for jury duty; is legally and otherwise disqualified for jury duty.

"(3) That the verdict rendered was contrary to law and the evidence; was erroneously rendered, in that its formation and rendition was participated in by the illegal and disqualified juror, Paul G. Sarvis.

"(4) That the evidence adduced at the trial would not support a verdict greater than manslaughter."

The allegations of error imputed to the trial Judge in refusing to grant a new trial, based on the ground that his Honor should have ordered a continuance of the case, are disposed of by what we have stated hereinabove in our discussion of the motion for a continuance.

The error imputed to the trial Judge in overruling the motion for a new trial, based on the grounds stated under Nos. 2 and 3, quoted above, presents a serious question. The

record discloses that Paul G. Sarvis, who was drawn and accepted as a juror in this case, was at that time a bonded constable in the said county of Horry, serving as constable for Magistrate J. N. McCormack. For this reason Mr. Sarvis, under the law of this State, was not qualified to serve as a juror, and should not have served as a juror in this case. His name should not have been placed in the jury box. In support of the motion for a new trial, based on this ground, the appellant's attorney, who resides in an adjoining county of the county of Horry, presented the following supporting affidavit made by the Clerk of Court for the county of Horry (quoting only the pertinent parts of the same) :

"John Holt, being duly sworn says that he is the Clerk of Court for Horry County, South Carolina; that prior to the trial of Henry B. Elliott, Jr., who is charged with the murder of his wife, that W. D. Jenerette, Attorney for the defendant, Elliott, came to deponent in an effort to ascertain the status of each prospective juror which then composed the venire. That deponent stated to W. D. Jenerette that Paul G. Sarvis, a member of the venire was a good substantial man, a farmer and would make a good juror in the opinion of deponent.

"Deponent further states that deponent is and was a member of the Jury Commission, that he participated in drawing the venire; that Paul G. Sarvis, is and was a bonded constable and should not have been drawn as a juror. That deponent failed to apprize W. D. Jenerette, Attorney for the defendant, of this fact.

"Deponent further states that juror Paul G. Sarvis, is an officer of this Court and is legally ineligible for jury duty; that the name of Paul G. Sarvis, through error was placed in the jury box."

It will be observed that while Mr. Holt, in his affidavit, states that the attorney for the defendant went to him "in an effort to ascertain the status of each prospective juror which then composed the venire," it is not disclosed by the

affidavit that any questions were asked regarding the legal qualifications of any juror; nor is it shown by this affidavit that Mr. Holt, the Clerk of Court and a jury commissioner in said county, made any statement regarding the legal qualifications of this juror. In fact, it is not shown by this affidavit that Mr. Holt knew at the time of the said conversation with said attorney that the juror in question was a bonded constable in said county. Of course, being clerk of the office where bonds of constables are presumed to be filed, it may be contended that he was presumed to have such information, but a clerk of court's office is usually a busy place and it is not reasonable to assume that the clerk of such office can carry in mind every transaction that passes through the office or every paper that is filed therein. In fact, it is commonly known that the officer in charge of such office has assistants and very often papers are filed therein without the knowledge of such clerk. We do not know that such was the fact with reference to the matter under discussion and it is not necessary for us to decide such question, but we refer to the same in connection with the holding of the trial Judge that due diligence was not shown in ascertaining the legal qualifications of the juror in question. While Mr. Holt, in his affidavit, states that he did not, at the time of the conversation had with the attorney, inform such attorney that Mr. Sarvis was a bonded constable, the principal positive statement that Mr. Holt made to the attorney was "that Paul G. Sarvis, a member of the venire, was a good, substantial man, a farmer and would make a good juror in the opinion of deponent." What occurred in said conversation between the defendant's attorney and Mr. Holt, as disclosed by Mr. Holt's affidavit, did not relieve the defendant from making further inquiry for the purpose of ascertaining the qualifications of the jurors. In this connection we call attention, as pointed out by the Circuit Judge (and we must assume that the Judge had such information), that the list of the jurors was published in the county news-

papers of said county for two weeks preceding the term of Court at which the defendant was tried, and, further, that the appointment of Mr. Sarvis as constable was on file in the said office and there was nothing to have prevented the defendant or his counsel from examining the records in said office; also, that "the jurors were each put on their *voir dire* so that the defendant might inquire as to their qualifications." We also call attention to the fact that the defendant has resided in the said county of Horry for many years and is, therefore, presumed to have some knowledge of the people and officers of said county; and we call attention to the fact, also, that so far as the record discloses, the defendant did not present an affidavit in support of the motion as to what he knew about the qualifications of the juror in question or what diligence he used for the purpose of acquiring knowledge about such jurors and their qualifications. The only affidavits in support of the motion for a new trial is the affidavit of Mr. Holt, above referred to, and an affidavit of the sheriff of the said county to the effect that Mr. Sarvis was the magistrate's constable. As stated, the juror, Mr. Paul G. Sarvis, being a constable in the said county, was not qualified to sit as a juror in the case and the jury commissioners ought not to have put his name in the jury box. See Section 627, Code of 1932. But it is the duty of a defendant to make objection to a disqualified juror before the jury is impaneled and sworn, and failing to do this the defendant is presumed to have waived such objection, and, waiting until after a verdict is rendered, is not entitled on a motion for a new trial to avail himself of such objection, unless it is shown that the defendant and his counsel did not before the trial have knowledge of such disqualification, and, further, that due diligence was used in trying to acquire such information. Appellant cites, in support of his position, the case of *Garrett v. Weinberg,* 54 S. C., 127, 31 S. E., 341, 34 S. E., 70; *Id.,* 57 S. C., 11, 35 S. E., 390. In that case, in which the opinion was written by Chief Justice Mc-

Iver, this Court held that a new trial should be granted if a disqualified juror sat in the case, *if neither the party litigant nor his attorney had knowledge of such disqualification until after the verdict*. In that case no reference was made to the use of diligence in acquiring information regarding the disqualification of a juror. However, in a subseqent case, *State v. Robertson*, 54 S. C., 147, 31 S. E., 868, 870, in which case the opinion was also written by Chief Justice McIver, the question of the use of diligence was considered. In that case the Court had this to say regarding the question: "For, while it is true that in the cases of *Kennedy v. Williams*, 2 Nott & McC., 79, and *Garrett v. Weinberg, supra,* some stress is laid—and, in a proper case, properly laid—on the fact that the disqualification of the juror was not known to the party or his counsel until after the trial, yet we think this should be qualified by the proviso that such ignorance is not due to the want of diligence, for, where the disqualification relied on might have been discovered by the exercise of ordinary diligence, it affords no excuse for failing to make the objection in due season, for, as was said in *State v. Fisher, supra* [2 Nott & McC., 261], a party 'should not be permitted to take advantage of his own negligence.' In this case, as we have seen, the appellant failed to make use of the means afforded by the law to enable him to ascertain the qualifications of each juror presented, and he must take the consequences of his own default."

In the case of *Mew v. Charleston & S. Railway Company,* 55 S. C., 90, 32 S. E., 828, the Court again, in which the opinion was written by Mr. Justice Jones, later Chief Justice, had occasion to consider the question under consideration and made it clear that in order for a person to be entitled to a new trial, based on the ground that a disqualified juror sat on the case, it *is incumbent upon him to show the Court not only that both he and his counsel had no knowledge* of such disqualification of the juror before the *verdict was rendered* (*this was not done in the case at bar*), but

also must show that due diligence was used in trying to acquire such knowledge and information. The same rule was also declared in the case of *State v. Langford*, 74 S. C., 465, 55 S. E., 120. The case of *State v. Rector*, 158 S. C., 212, 155 S. E., 385, has a bearing on the motion now before the Court. As stated by the Court in these cases, a person should not be permitted to take advantage of his own negligence. After considering the motion fully, in connection with the supporting affidavits and all the proof in the case bearing on the motion, his Honor, Judge Shipp, in refusing the motion, held that the defendant had not used due diligence in ascertaining the fact that the juror in question was disqualified to sit on the case. From the record before us we cannot hold that his Honor, Judge Shipp, was wrong. While we do not think it necessary to do so, we call attention to the fact that the words, "had not used due diligence in ascertaining the fact," used by Judge Shipp in his order refusing the motion, were used in the same sense as the words, "that such ignorance is not due to the want of diligence," and the words "might have been discovered by the exercise of ordinary diligence," used in the opinion in the case of *State v. Robertson, supra*.

The contention of the appellant that the trial Judge erred in refusing, the motion for a new trial, based on the ground that the juror, Paul G. Sarvis, was disqualified to sit on the case, for the reasons stated herein, cannot be sustained.

Another ground upon which the motion for a new trial was based was that the evidence adduced at the trial would not support a verdict greater than manslaughter. We are unable to agree with this position, but, on the other hand, think there was ample evidence to support the verdict rendered.

The deceased was married to the defendant January 10, 1931. They were both young. She was much smaller and younger than he. After the marriage the couple lived near the home of his parents in Horry County, a few miles dis-

tant from the home of her parents. They visited the home of her parents occasionally. According to the testimony of the father of the deceased, the defendant and the deceased did not get along altogether amicably. It appears that the defendant did not want his wife to be with his cousin Gatling Elliott, and on one occasion when he came home (which was in the daytime) and found his cousin at his home he made him leave. It further appears that this cousin Gatling Elliott was at the time paying considerable attention to a younger sister of the deceased, whom he later married, the marriage taking place a short time before the death of the deceased, and that during the courtship of this sister with Gatling Elliott, the deceased took letters from one to the other, and it further appears that she was friendly to Gatling Elliott and her sister, and, we may add, evidently encouraged their courtship, which led up to their marriage. Whether the defendant understood the reason for this friendliness or not toward his cousin Gatling Elliott, we are unable to say; but it is his contention on this appeal that this friendliness was the base of the trouble between the defendant and his wife which led up to her death on April 6, 1932, just a little over a year after her marriage to the defendant. The defendant did not go upon the stand at the trial, and offered no testimony. Therefore, the immediate facts surrounding the death of the deceased can only be ascertained from the testimony offered by the State, which included statements alleged to have been made by the defendant, and also a written statement signed by the defendant, admitting that he killed his wife. According to testimony offered by the State, the defendant, on the afternoon of April 6, 1932, went to the home of his father and mother, which was only a short distance away, for the purpose of giving the alarm that his wife was dead. He stated at that time that his wife had taken her own life and made similar statements to that effect on several occasions after her death to different parties. The news of the death soon spread, and in a short time a num-

ber of the neighbors gathered at the home, finding the deceased lying across the bed, dead, with a long knife lying beside her. Dr. Ford, the physician who was first called to view the body of the deceased, testified at the coroner's inquest, in effect, that he made an examination of the body the following morning after her death, finding a wound in the left breast, between the second and third ribs, and that in his opinion the wound penetrated the heart. Further testimony is that that wound produced the death of the deceased. Several days after the death of the deceased the defendant was arrested and taken to the state penitentiary, and while there he made a confession, stating that he had killed his wife. His admission and confession was taken in writing, signed by him, and witnessed by C. L. Melton, W. F. Newman, and J. W. Richardson. This paper, which was introduced in evidence, reads as follows:

## "The Confession

"Statement of H. B. Elliott, Jr., Defendant.

"I want to make a truthful statement in regards to my wife's death on Wednesday, April 6, 1932, in the afternoon my wife and I had some words right after we got back to our home from picking the tobacco bed. She was washing her face and hands. We began quarreling about her going to Gatlin Elliott's house. I did not want her to go and I said to her: 'The bus has gone and you can't go now.' She says: 'Well, I will go tomorrow.' I sit down on the bed and she came there by me and began fussing, cursing and quarreling with me. I told her to hush. She said she would say what she pleased and go where she pleased. I said 'Well, we will see about it, whether you go where you please or not.' Then she slapped me and scratched me on my arm and I saw blood running from my arm. And I was already mad. And that made me so mad I didn't know what I was doing. And then I took my knife out of my pocket and stabbed her. She fell back on the bed and kind of turned over on her side—

right side. She only gasped one time. I then layed the knife down on the bed. And I went then and watered the tobacco bed. I thought she was dead when I left the house. After I finished watering the tobacco bed, I returned to the house. I went in the house and felt her hands and face. Her hands were cold.

"Then I went and told my father that May was dead; she had killed herself. Then my two sisters, father and mother came over to my house and my mother made the alarm. As well as I remember Albert Bryant was the first one to come to my home. Then other neighbors began coming in. I did not tell any one but the family that she had killed herself. I might have told one or two others around there. This all happened some time between three and 4 o'clock, on afternoon of April 6, 1932.

"This is a true and voluntary statement of my own free will and accord, without any promise of reward.

"April 24, 1932.

"[signed]  H. B. ELLIOTT, JR.

"Witnesses:

"C. L. Melton,
"W. F. Newman,
"J. W. Richardson."

It is the contention of the State that so much of this statement as admits the killing is true, but the State contends that the killing did not occur in the manner stated in this confession by the defendant. The State offered testimony to the effect that the defendant had threatened the life of the deceased and had planned to take her life and also offered testimony from which the inference may be reasonably drawn that the deceased was killed in a different manner stated in the confession; that the body was moved from where the deceased was killed. There was also evidence of blood stains on the floor of the room containing the bed, on which she was later found, and there was testimony to

the effect that the defendant burned one of the quilts, stained by the blood of. the deceased.

The testimony bearing on these matters, to which we have above referred, is very lengthy, but we deem it unnecessary to·refer further to the same. In our opinion, the verdict rendered by the jury is amply supported by the testimony, and for that reason we think the trial Judge properly refused to grant the motion for a new trial, based on the ground that the testimony did not support a verdict greater than manslaughter.

For the reasons stated above, the exceptions should be overruled and the judgment of the lower Court affirmed.